IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CAROL THOMAS,

        Plaintiff,

   v.

SAN FRANCISCO HOUSING

AUTHORITY,

        Defendant.

Case No. 16-cv-03819-CRB

**ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT**

Plaintiff Carol Thomas ("Thomas" or "Plaintiff") alleges violations of the Fair

Housing Act ("FHA" or "Act") based on: (1) racial discrimination; (2) retaliation; and (3)

failure to reasonably accommodate her disability.[1] See generally Third Amended

Complaint ("TAC") (dkt. 36).[2] This Court previously dismissed Thomas's disability claim

with prejudice. See 2nd Order Dismissing With Leave to Amend (dkt. 34) at 2.

Accordingly, Defendant San Francisco Housing Authority ("SFHA") moves for summary

judgment on the remaining claims. See Motion for Summary Judgment ("MSJ") (dkt. 62-

1). Because Thomas has failed to meet her burden of identifying evidence with

---

[1] The TAC alleges broad violations of "Title VI of the 1964 Civil Rights Act," which prohibits
discrimination on the basis of race in programs and activities that receive federal funding, as well
as Title VIII of the Civil Rights Act of 1968 (Fair Housing Act). See generally TAC. The TAC
also includes a single, apparently erroneous reference to "Title VII." See id. at 5. The substance
of Thomas's three specific claims fall under the Fair Housing Act. See generally id. (alleging
violations of subsections "804(b)" for racial discrimination, "818" for retaliation, and
"804(f)(3)(B)" for denial of reasonable accommodation, as amended by 42 U.S.C. §§ 3601–
3619).
[2] The Third Amended Complaint is erroneously titled the "Second Amended Complaint," and the
Second Amended Complaint is erroneously titled the "First Amended Complaint."

"reasonable particularity" in support of her allegations, the Court **GRANTS** SFHA's motion. See Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).

## I.      BACKGROUND

Both parties agree that Thomas, an African-American woman, was a resident at the Ping Yuen North ("PYN") building from April 2009 until May 2017. See Second Amended Complaint ("SAC") (dkt. 17) at 6[3]; Earley Decl. Ex. F (dkt. 62-3) at 1. Thomas moved out of her unit in May 2017 under threat of eviction. See Early Decl. Exs. G–K. Both parties agree that PYN was under the management and ownership of the SFHA until August 2016, when the plan to have the property transferred to subsidized housing under the management of Chinatown Community Development Center ("CCDC") was approved.[4] See generally Earley Decl. Ex. F at 27; 2nd Opp'n (dkt. 64) at 2–3. The transfer converted PYN from Public Housing assistance to a Project Based Voucher ("PBV") subsidy program under the United States Department of Housing and Urban Development ("HUD") Rental Assistance Demonstration ("RAD") program. Id. Both parties assert that Thomas signed a new lease with CCDC effective September 2, 2016, at which point her housing status converted from Public Housing assistance to a PBV program under RAD. See SAC at 10; Earley Decl. Ex. F at 5.

The gravamen of Thomas's claims is that from "January 2012 to the present she has been subject to disparate impact and disparate treatment" because SFHA "imposed certain terms and conditions upon [her] and offered more favorable terms and conditions to Asian Americans [sic]." SAC at 3; see also TAC at 4–12.

On September 6, 2013, prior to filing her complaint in district court, Thomas allegedly filed a "discrimination complaint" against SFHA with HUD.[5] See TAC at 4.

---

[3] Of course, once Thomas filed the TAC, it became the operative complaint, superseding the SAC. See Rhodes v. Robinson, 621 F.3d 1002, 1005 (9th Cir. 2010). However, this order occasionally references the SAC because the TAC is lacking some of the information provided in the SAC that is necessary for a thorough analysis of this motion.

[4] Neither party provides evidence that the property was officially transferred to CCDC at that time. The only evidence in the record is the RAD "Relocation and Transition Plan Phase I and Phase II" that was "approved – August 11, 2016." See Earley Decl. Ex. F at 27.

[5] Neither party provides evidence that Thomas filed her first HUD complaint on September 6,

HUD dismissed that complaint with a "Determination of No Reasonable Cause" on August 4, 2014. See TAC Ex. A at 23–24. Thomas filed a "second HUD complaint [against SFHA] alleg[ing] one or more discriminatory/Disparate treatment housing practices" on June 29, 2016. Id. at 4. HUD dismissed that complaint with a "Determination of No Reasonable Cause" on April 5, 2017. See Earley Decl. Ex. E at 22–23.

On July 7, 2016, Thomas filed a complaint in this district alleging violations of the FHA, and Title VI of the Civil Rights Act of 1964. Compl. (dkt. 1). On July 13, 2016, Magistrate Judge Laporte granted Thomas's request to proceed in forma pauperis ("IFP"). Order Re IFP (dkt. 6); see also IFP App. (dkt. 3). After Thomas declined magistrate jurisdiction, see Declination (dkt. 7), on July 19, 2016, Magistrate Judge Laporte recommended that the case be dismissed with leave to amend and directed that it be reassigned to a district court judge, Report and Recommendation (dkt. 8) at 1 ("R&R"). The case was reassigned to this Court. Order Reassigning Case (dkt. 9). The Court adopted Magistrate Judge Laporte's recommendation, dismissing the case and giving Thomas leave to amend. Order Adopting R&R (dkt. 12).

On August 26, 2016, Thomas filed her First Amended Complaint ("FAC"). FAC (dkt. 14). The Court dismissed the FAC with leave to amend on September 15, 2016, finding that it "[did] not provide the requisite facts necessary for [the] Court to reasonably infer that Defendants are liable under" Thomas's claims, and that it "[did] not identify the legal basis for either claim." 1st Order Dismissing With Leave to Amend (dkt. 15) at 3–5. On October 6, 2017, Thomas was served with a notice of deposition and request for production of documents. See Jewell Decl. Ex. C (dkt. 62-2) at 91. The deposition was set to take place on October 27, 2017. Id. Thomas failed to attend the deposition and did not respond to follow-up correspondence, phone calls, or e-mails concerning her failure to attend. See Jewell Decl. Ex. G at 128.[6] It appears that Thomas has still not been deposed.

---

2013, but both parties agree that a complaint was filed, and the complaint was dismissed on August 4, 2014. See TAC Ex. A at 23–4; Earley Decl. Ex. C at 15–16.

[6] As to the deposition, Thomas claims that "Colin Jewell never said that Ms. Thomas confirmed any dates to appear for a deposition on the dates he chose." See Thomas Decl. in 2nd Opp'n at 16. Thomas goes on to say that "Ms. Thomas sent an email giving notice of the dates she was available, but the secretary states that 'Colin is not available for those dates' Exhibit _____." Id. Thomas left all exhibit citations blank, but it appears that Exhibit H is the exhibit Thomas failed to

Thomas filed her SAC on October 12, 2016.  SAC.  Following another motion to dismiss, the Court on March 6, 2017 dismissed Thomas's disability claim with prejudice, and gave Thomas leave to amend the retaliation and discrimination claims.  Amended MTD (dkt. 30); 2nd Order Dismissing With Leave to Amend at 2.  The Court found that while the disability claim was barred by the statute of limitations, "the deficiencies in her SAC [relating to her retaliation and discrimination claims] appear curable by amendment." 2nd Order Dismissing With Leave to Amend at 2.

Thomas filed her Third Amended Complaint, mislabeled "Second Amended Complaint," on March 31, 2017.  TAC.  SFHA filed a motion for summary judgment on January 19, 2018.  See MSJ.  On February 2, 2018, Thomas opposed SFHA's motion for summary judgment.  2nd Opp'n.  SFHA filed a reply on February 9, 2018.  2nd Reply (dkt. 65).  The motion for summary judgment hearing was held on March 2, 2018.  See Dkt. 66.

## II.    LEGAL STANDARD

Summary judgment is properly granted when no genuine dispute of material fact remains, and when, viewing the evidence most favorably to the nonmoving party, the movant is entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett,  477 U.S. 317, 322–23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288–89 (9th Cir. 1987).

The moving party bears the burden of showing the absence of any genuine issues of

cite.  2nd Opp'n Ex. H at 41.  The exchange is between Thomas and Kathryn Benham, who appears to work with Colin Jewell.  Id.  In the e-mail, Benham informed Thomas of a few dates that Colin Jewell was available and Thomas responded with "I'll confirm a date by Wednesday." Id.  It does not appear that Thomas ever confirmed a date or suggested any dates that she was available.  Further, in regards to her failure to respond to correspondence with SFHA and meet in person or telephonically with SFHA regarding the deposition, as required by Judge Kandis A. Westmore's standing order, See Jewell Decl. Ex. G at 128, Thomas states, "the defendant did not file a written request for a telephonic conference with the Judge for the purpose of enforcing the Court's meet and confer requirement as Colin stated in his letter dated November 30, 2017.  No such request is on the docket. Exhibit _____."  See Thomas Decl. in 2nd Opp'n at 16.  It appears that the exhibit Thomas failed to cite is Exhibit I, which does state that "in the event you [Thomas] fail to meet in person or telephonically … SFHA will file a written request for a telephonic conference with the Judge for the purpose of enforcing the Court's meet and confer requirement." 2nd Opp'n Ex. I at 45.  While there does not appear to be such a request on the docket, Thomas does not deny or explain her failure to respond to the correspondence and meet with SFHA in the first place.  See generally Thomas Decl. in 2nd Opp'n at 16.  Nor does Thomas argue via affidavit or declaration that she has been prejudiced by the failure to sit for a deposition.  See Fed. R. Civ. P. 56(d).

material fact. <u>Celotex</u>, 477 U.S. at 322. Therefore, the court must regard as true the opposing party's evidence if it is supported by affidavits or other evidentiary material. <u>Id.</u> at 324; <u>Eisenberg</u>, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

A fact is material if it could affect the outcome of the suit under the governing law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248–49 (1986). A dispute about a material fact is genuine if the admissible evidence on the record "is such that a reasonable jury could return a verdict" for either party. <u>Id.</u> at 248.

Where, as here, the moving party does not have the ultimate burden of persuasion at trial, the moving party may discharge its burden of production by either (1) producing evidence negating an essential element of the nonmoving party's case, or (2) showing that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. <u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party discharges its burden by negating an essential element of the nonmoving party's claim or defense, it must produce affirmative evidence of such negation. <u>Nissan</u>, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the nonmoving party to produce specific evidence to show that a dispute of material fact exists. <u>Id.</u> On the other hand, if the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the nonmoving party's claim. <u>Id.</u>; <u>see also</u> <u>Bhan v. NME Hosps., Inc.</u>, 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows such an absence of evidence, the burden then shifts to the nonmoving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." <u>Id.</u>

If the moving party does not meet its initial burden of production by either method, the nonmoving party is under no obligation to offer any evidence in support of its opposition. <u>Id.</u> This is true even though the nonmoving party bears the ultimate burden of

persuasion at trial. Id. at 1107.

It is not the court's task to "scour the record" for a genuine issue of triable fact. Keenan, 91 F.3d at 1279. The nonmoving party has the burden to "identify with reasonable particularity the evidence that precludes summary judgment." Id. (citing Richards, 55 F.3d at 251). If the nonmoving party fails to do so, the district court may properly grant summary judgment in favor of the moving party. See Carmen v. San Francisco Unified Schl. Dist., 237 F.3d 1026, 1028–29 (9th Cir. 2001) (a court may grant summary judgment, even if evidence in the court file creates a genuine issue of material fact, if the opposing papers do not set forth that evidence with adequate references so the evidence can be easily found).

## III.    DISCUSSION

This order will analyze each of Thomas's three claims: (A) racial discrimination, (B) retaliation, and (C) implied warranty of habitability.

### A.    Racial Discrimination Claim

Thomas's first claim, racial discrimination, arises under the FHA. Most courts have analogized the FHA to Title VII of the Civil Rights Act of 1964 and thus apply Title VII discrimination analysis to FHA discrimination claims. See Pfaff v. United States Dep't of Hous. & Urban Dev., 88 F.3d 739, 745 (9th Cir. 1996); Larkin v. Michigan Dep't of Social Servs., 89 F.3d 285, 289 (6th Cir. 1996). Thus, a plaintiff can establish an FHA discrimination claim under a theory of disparate treatment, or disparate impact. See Pfaff, 88 F.3d 745; Larkin, 89 F.3d at 289. In the TAC, Thomas does not specify which theory she is asserting as to which claim. For cautionary purposes, this order analyzes each claim under both theories.

To bring a disparate treatment claim, a plaintiff must first establish a prima facie case. Harris v. Itzhaki, 183 F.3d 1043, 1051 (9th Cir. 1999). To establish such a prima facie claim for disparate treatment, or "intentional discrimination," a plaintiff must demonstrate that: (1) she is a member of a protected class under the FHA; and (2) "as a result of the defendant's discriminatory conduct, plaintiff has suffered a distinct and palpable injury." Id. If the plaintiff establishes the prima facie case, the burden shifts to

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

the defendant to articulate a legitimate, nondiscriminatory reason for its action. Lam v. University of Hawai'i, 40 F.3d 1551, 1559 (9th Cir. 1994). Thomas is an African-American female alleging racial discrimination, thus, she falls under the protection of the Act and satisfies the first element of a disparate treatment claim. See 42 U.S.C. § 3604(b) (covering six protective classes: race, color, religion, sex, familial status, and national origin); see also TAC at 1. Despite this, Thomas fails to establish a prima facie case of disparate treatment. She has presented no evidence that there was any intentional discriminatory conduct. As this issue of material fact could not reasonably be resolved in favor of the nonmoving party, summary judgment is GRANTED. See Anderson, 477 U.S. at 248.

To bring a disparate impact claim, a plaintiff must plead: (1) the existence of outwardly neutral practices; (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices; and (3) facts demonstrating a causal connection between the specific challenged practice or policy and the alleged disparate impact." Hernandez v. Sutter West Capital, No. C 09-03658 CRB, 2010 WL 3385046, at *3 (N.D. Cal. Aug. 26, 2010) (citing Pfaff, 88 F.3d at 745). Here, as with her allegations of disparate treatment, Thomas has failed to present any evidence to support her allegations of disparate impact. In particular, Thomas has failed to provide evidence that a causal connection exists between the challenged policies she cites and the alleged disparate impact, and thus summary judgment is GRANTED.

This order will analyze the four bases for Thomas's racial discrimination claim: (1) the alleged  preferential treatment shown to Asian-American tenants over African-American tenants in moving into the PYN building, (2) the alleged issuance of erroneous rental statements to African-American tenants, (3) the alleged preference shown to Asian-American tenants over African-American tenants in transferring them from studios to one-bedroom units within the PYN building, and (4) the alleged preference shown to Asian-American tenants over African-American tenants in being relocated to other CCDC properties during building construction.

### 1.    Moving Into PYN

The first basis for Thomas's racial discrimination claim is the allegation that in 2008 and 2009, "Asian applicants with offer letters to move into PYN properties were moved into units prior to African Americans. . . ." TAC at 10.  Thomas alleges specifically that "at that time Carol was intentionally oppressed and was not able to view any of the available units for four months because she was treated differently than other similarly situated individuals that is [sic] not in her protected group." Id. at 7.

Thomas fails to provide any evidence in support of her allegation that all Asian applicants were moved into PYN first, that she was intentionally oppressed, or that this behavior was intentionally discriminatory, and thus this basis cannot support her racial discrimination claim under the theory of disparate treatment.[7]

As to disparate impact, assuming that moving individuals into PYN properties is an outwardly neutral practice, Thomas has failed to provide any evidence to show a connection between the practice and the alleged disparate impact.  Thus, this allegation also fails to support her discrimination claim.

Even if Thomas had provided evidence to support the allegation under either theory, the allegation is time-barred by the FHA's two-year statute of limitations.  See 42 U.S.C. § 3613(a)(1)(A).  A plaintiff must raise a claim under the FHA within two years of "the occurrence or the termination of an alleged discriminatory housing practice." Id.  The statute of limitations is tolled during an administrative proceeding regarding a complaint "based upon [a] discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(B).  Here, the TAC alleges that the last occurrence of this discriminatory practice was in 2009.  TAC at 10.  Thomas alleges that she did not file her first HUD complaint until September 6, 2013.  TAC at 4.  As a result, this basis for Thomas's discrimination claim fails because it is barred by the two-year statute of limitations under Section 3613(a).

---

[7]  Thomas cites to a few letters she sent to SFHA that expressed her frustration with not being moved into PYN more quickly.  TAC Ex. B at 26, 27.  In one of the letters Thomas states that "I feel that Im [sic] being discriminated against by Ms. Wei because of her belligerent behavior towards me in her office space." Id. at 26.  Thomas alleges that Ms. Wei was "not forthcoming with any information" and displayed a "nonchalant attitude towards me[,] I quote her 'continue to be patient' . . ." Id.  Despite this, there is no evidence that Thomas's transfer was delayed because Ms. Wei has a preference for Asian applicants.

### 2. Rental Statements

The second basis for Thomas's racial discrimination claim is that SFHA disproportionately issues erroneous, inflated rental statements to African-American tenants like herself. TAC at 14. She states that the "defendant refused to grant exclusions and deductions for which African-American resident households were entitled. The ledger was used as a tool to start the process of eviction notices to quit, mostly for African-Americans."[8] Id.

Thomas offers no evidence to support those statements, or any other evidence to suggest intentional discriminatory conduct or the existence of a facially discriminatory policy wherein SFHA treats African-Americans differently in connection with their rental statements on the basis of race.[9] See Gomez v. Quicken Loans, Inc., 629 F. App'x 799, 801–02 (9th Cir. 1997) (noting that a claim for disparate treatment can be established where the complaint adequately pleads the existence of a "facially discriminatory policy."). Thus, this basis for Thomas's discrimination claim fails under a theory of disparate treatment.

---

[8] SFHA alleges that Thomas was simply not entitled to the deductions she references in the TAC. See Earley Decl. ¶ 11. Indeed, Thomas was not entitled to the rent exemption for students that she cited, TAC at 15, because she was the head of household, see 24 C.F.R. 5.609(c)(11). Thomas states that she attended the City College of San Francisco from August 2015 to December 2015, TAC at 15, but does not provide any evidence of this. SFHA also alleges that Thomas did not qualify for a rental exemption for participating in the Workforce Investment Act ("WIA") program.in 2015. See Earley Decl. ¶ 11. Thomas offers no evidence to the contrary, and while Thomas might have qualified for an exemption under the WIA at some point, the Workforce Investment Act was superseded by the Workforce Innovation and Opportunity Act on July 1, 2015. See 29 U.S.C. § 3101. Thomas also alleges that she was qualified for a rental exemption under the Job Training Partnership Act ("JTPA"), TAC at 15, but the JTPA was repealed by the WIA in 1998, see 29 U.S.C. § 1501.

Even if Thomas qualified for a rental exemption under either act, there is no evidence that the failure to provide her with that rental exemption was intentionally discriminatory conduct or was part of a policy that had a significantly adverse or disproportionate impact on African-American tenants in her building. Thus, these allegations fail under both disparate treatment and disparate impact.

[9] As to discriminatory rental statements, Thomas asserts that "intentional discriminatory conduct and the existence of a facially discriminatory policy wherein SFHA treated African-Americans differently on the basis of their race will be discovered at trial by summoned witnesses who will testify that they have experienced less favor as a person of a protected group African Americans [sic]." 2nd Opp'n at 5. A plaintiff cannot survive a motion to dismiss by claiming that evidence will be made available in the future. Rule 56 requires the nonmoving party to "go beyond the pleadings and … designate 'specific facts showing that there is a genuine issue for trial,'" which Thomas has failed to do here. See Celotex, 477 U.S. at 324.

As to disparate impact, assuming that issuing rental statements is an outwardly neutral practice, Thomas's allegations regarding the disproportionate impact on African-American residents are wholly conclusory and unsupported by any evidence. Thus, this basis for Thomas's discrimination claim fails under a theory of disparate impact.[10]

### 3. Internal Transfer to One-Bedroom Unit

The third basis for Thomas's racial discrimination claim is that SFHA denied her reasonable accommodation request for a transfer to a one-bedroom unit because of her race. TAC at 8. Thomas alleges that "according to documentary evidence that was given to HUD and an investigation interview with the SFHA Director of Client Placement, six one-bedroom units… were rented (January 18, 2012 and December 5, 2013) and six one bed room units went to members who were not members of the plaintiff's protected class." Id. at 9.

As to disparate treatment, Thomas fails to identify any conduct undertaken by SFHA to intentionally deny qualifying African-American tenants from occupying one-bedroom units. Furthermore, even taken as true, the allegation that more African-Americans than Asian-Americans occupy efficiency units fails to support a claim of intentional discriminatory conduct because Thomas fails to specify that single African-American tenants, like herself, are refused one-bedroom units in favor of single Asian-American tenants. Beyond her conclusory statements, Thomas offers no evidence that SFHA denied her transfer request for a one-bedroom unit on the basis of her race, and thus this allegation fails as a basis of her racial discrimination claim.[11]

As to disparate impact, assuming that managing internal transfer requests to other units in the building is an outwardly neutral practice, Thomas's allegations regarding the disproportionate impact on African-American residents are wholly conclusory and

---

[10] In the second opposition, under the section heading "Disparate Impact," Thomas asserts that "after the plaintiff survives the motion for summary judgment, PYN African-American Tenants will be ready to be summoned to trial to testify that they experienced the same mental anguish regarding inaccurate and erroneous rental statements (balloon increases) in rent claimed to be owed during the proposed RAD transfer." 2nd Opp'n at 5. Again, a plaintiff cannot survive a motion to dismiss by claiming that evidence will be made available in the future. See Celotex, 477 U.S. at 324.

[11] Thomas alleges that "race was a substantial and motivating factor for the defendant's discriminatory actions" but offers no evidence to support the allegation. See TAC at 7.

unsupported by any evidence. Therefore this too fails as a basis of Thomas's racial discrimination claim.

### 4. External Transfer

The fourth basis for Thomas's discrimination claim is that significantly fewer African-American residents are being transitioned out of PYN during building construction than non-African-American residents. See TAC at 10. Thomas states that "out of the total one hundred households that moved [out of PYN since September 2016] only six African[-]American households moved with that group who all moved into one of the several CCDC properties (not private property)." Id.

Thomas fails to provide any evidence that significantly fewer African-American residents are being transitioned out of PYN than non-African-American residents, or any evidence that this alleged conduct was intentionally discriminatory, and thus this allegation cannot support Thomas's racial discrimination claim under the theory of disparate treatment.[12]

As to disparate impact, assuming that transitioning individuals out of PYN is an outwardly neutral practice, Thomas fails to point to any evidence that there was a significantly adverse or disproportionate impact on African-American tenants as a result of this practice, or that that there is a causal connection between this practice and the alleged disparate impact. Thus, this allegation also cannot support Thomas's racial discrimination claim under the theory of disparate impact.

---

[12] Thomas cites to a "witness declaration" which states that "she [the witness, Diana Greer, a white woman] wanted to be moved close to her neighborhood and was provided with an apartment four blocks from PYN." TAC at 12. In the declaration (attached to the TAC), Greer does express interest in moving into another CCDC building, but does not say anything about being provided an apartment. Id. Ex. C at 30. On the typed declaration is a handwritten note that says "Diana Greer, moved out of PYN two 2wks ago." Id. It is not clear who wrote the note. Despite this declaration, there is no evidence to suggest that CCDC's failure to transfer Thomas was in any way racially motivated. Thomas does not address the many other explanations for why Greer might have been moved first, including the fact that Greer has a child and thus occupies a two person household. See id.

Thomas also alleges that two Chinese women were moved to another floor in the PYN building during the transitional period and that a Chinese woman and a Korean woman were both moved from PYN to another apartment building during the transition. Id. at 12. Thomas provides no evidence to support these allegations, nor does she provide any evidence that these women were transitioned before her "because the defendant gives preference to the Asian tenants." See id. These allegations are not sufficient to withstand a motion for summary judgment.

Even if Thomas had provided evidence to support this basis of her FHA discrimination claim, it would be of no moment because her grievances about CCDC's operation and management of her building are misdirected at SFHA. SFHA no longer owned or managed the PYN building after August 2016, and thus had no role in the relocation of tenants. See generally Earley Decl. Ex. F at 27. Similarly, Thomas's allegation that SFHA showed "deliberate indifference" when it did not consider that PYN is "one third racially diverse" when it planned to start construction in connection with the RAD conversion does not apply to SFHA, much like her allegation that the failure of Cathy Lam (CCDC's relocation manager) to transfer Thomas was racially motivated. TAC at 11. All of Thomas's concerns with regard to the construction process occurred after the transfer of the property to CCDC, as did Thomas's request for transfer from Ms. Lam. Id. Further, the alleged decrease in African-American PYN households and corresponding increase in Asian-American PYN households and Asian-American PYN office staff occurred "after the transitional move" to CCDC.[13] Id. at 6. These allegations also fail to support Thomas's discrimination claim as SFHA no longer owned or managed the PYN buildings at the time these alleged grievances occurred.[14]

## B. Retaliation Claim

Thomas's second claim, retaliation, also arises under the FHA. Under the FHA, it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, . . . any right granted or protected" by the FHA. 42 U.S.C. § 3617. To state a claim for retaliation under the FHA, a plaintiff must show that: (1) she engaged in protected activity; (2) the defendant subjected her to an adverse action; and (3) "a causal link exists between the protected activity and the adverse action." Walker v. City of Lakewood, 272 F.3d 1114, 1128 (9th

---

[13] Thomas presents no evidence to support the assertion that Asian-American households have increased while African-American households have decreased, nor does she offer any evidence to support her assertion that the property's "management and office staff consist of 99% Asian Americans." See TAC at 6.

[14] Thomas also seems to allege, though the allegation is rather unclear, that there was some relationship that continued between PYN and CCDC following the transition of the property to CCDC. See TAC at 6. Thomas fails to specify the nature of the alleged relationship and fails to provide any evidence to support this allegation. Id.

12

Cir. 2001).

Thomas asserts that SFHA retaliated against her after she allegedly filed her first HUD complaint in September 2013, asserting violations of the FHA. TAC at 13. Filing a housing discrimination complaint with a governmental agency pursuant to the FHA is protected activity under the Act. See Sturm v. Davlyn Investments, Inc., No. CV 12-07305 DMG, 2014 WL 2599903, at *6 (C.D. Cal. Jan. 27, 2014) (noting that even "informal complaints of race discrimination and requests for disability accommodations are protected activities under the FHA."). Like her allegations regarding disparate impact and disparate treatment, Thomas's allegations regarding retaliation are conclusory and lack supporting evidence. Thomas fails to provide any evidence that SFHA subjected her to an adverse action following the HUD complaint, or that the action alleged was causally related to that complaint, and thus summary judgment is GRANTED.

This order will analyze the three bases for Thomas's retaliation claim: (1) the allegedly threatening notices left at Thomas's door concerning her conversion to RAD, (2) the allegedly erroneous back rent put on Thomas's rental statements, and (3) the alleged refusal by SFHA to repair damage to Thomas's carpet.

### 1. Notices Regarding RAD Conversion

Thomas alleges that following the filing of her HUD complaint, she received threatening statements from SFHA "each month from July 2016 until January 2017" indicating that her household would not convert to RAD without satisfying debt she owed to SFHA for back rent. TAC at 13. Thomas cites to one particular notice to support this assertion, TAC Ex. H at 58, but it seems that Thomas misinterpreted the notice. The document does state that "your household will not convert to RAD without the following: 1) Debts owed to Public Housing Agencies and Terminations, 2) Authorization to Release Information..." but it is clear from the notice that "Debts owed to Public Housing Agencies and Terminations" is itself a document that must be filled out and returned in order for the RAD conversion to occur and not a demand that those debts be paid.[15] Id. On the

---

[15] Underneath the list of enumerated requested documents, the notice reads "the above are attached herein. Fill out the forms and submit them to the Property Office…" TAC Ex. H at 58.

13

contrary, SFHA provided Thomas with a notice explaining that while she was in debt, her debts would <u>not</u> impact her conversion to RAD, but that SFHA could still seek them in the future. <u>See</u> Earley Decl. Ex. D at 18. SFHA also offered Thomas the opportunity to enter into a repayment agreement to cure her outstanding debt with SFHA, but she did not do so. <u>See</u> <u>id.</u>

Further, Thomas failed to submit the recertification documents necessary to participate in the RAD program because she believed that "signing the re-certification means that the participant is satisfied with the unit size, believe [sic] that their civil rights are being protected …and that they appreciate living in a construction zone for an extended period of time." TAC at 18. It is unclear where Thomas got this information, and she fails to cite to any authority to support that allegation. Given the lack of evidence, this basis fails to support a retaliation claim.

### 2.     Rental Statements

The second basis for Thomas's retaliation claim is that SFHA deliberately placed an "inaccurate rental balance" on her rental statements. TAC at 14. Thomas also alleges that SFHA "retaliated against her by not correcting the error on her rental statement before or after the filing of her 2013 retaliation complaint." TAC at 16. Thomas notes that she "attended an informal grievance hearing . . . on 1/16/13" regarding her rental statements, and also "attended a formal grievance . . . on 7/19/10 regarding purported errors on her rent statements." SAC at 10; <u>see also</u> TAC at 13. Those dates are <u>before</u> Thomas allegedly filed her first HUD complaint in September 2013. Thus, they do not support her retaliation claim.

Thomas acknowledged in the SAC that the initial discrepancy with her back rent "was cured" following the formal grievance hearing on July 19, 2010, but alleges that the "negative amount reappeared" after she filed her HUD claim in 2013. SAC at 10. However, Thomas undermines that allegation by submitting with her TAC an exhibit regarding the erroneous back rent—ostensibly from the HUD investigation into her 2013 claim—that states, in part: "[T]he Director of Public Housing Operations stated that the issue was the result of a computer error. According to documentary evidence, during the

investigation[,] SFHA corrected the Complainant's rent ledger to remove money erroneously credited to her account, and explained . . . that it had made the correction and that <u>she owed unpaid rent for seven months</u>." <u>See</u> TAC Ex. K at 64 (emphasis added). Thomas does not submit any evidence indicating that she settled that debt.

Thomas provides no evidence to support her allegations that SFHA added "inaccurate amounts of rent debt," <u>see</u> TAC at 14, or failed to correct the "error on her rental statement," <u>see</u> TAC at 16. SFHA issued a rental statement indicating that as of September 1, 2016, Thomas owed $3,045 in back rent. SAC at Ex. C. Beyond Thomas's conclusory allegation, there is no basis to infer that the amount of back rent does not reflect an accurate amount that includes the "unpaid rent for seven months" noted above. In fact, Thomas states that she "received rental statements with the <u>ongoing incremental increases</u> showing a balance due on the stub for the rental amount around $3,000.00." <u>Id.</u> at 4 (emphasis added). Thomas does not point to any evidence that she has ever paid her back rent; thus, it is reasonable to infer that the "ongoing incremental increases" in the rental statements reflect Thomas's continued failure to pay her rent.

Thomas goes on to allege that "because the [rental] increase stayed on the tenant's financial summary record it complicated the transition process and negatively impacted her; therefore she was not able to participate in the recertification Agreement for the PBV program." TAC at 17. As previously stated, Thomas decided not to complete the recertification process because she believed that doing so would indicate that she was satisfied with her living situation. <u>Id.</u> at 18. Thus, this allegation fails as a basis for her retaliation claim.

### 3. Carpet Damage

Lastly, Thomas alleges that, as a result of the HUD complaint, SFHA is refusing to pay her $1,500 for damage to her carpet that allegedly occurred during SFHA's May 2016 routine housing inspection. TAC at 18. Thomas alleges that "the defendant demonstrated reckless indifference based solely on considerations relating to her discrimination complaint," <u>Id.</u> at 19, but fails to provide any evidence to support any nexus between the discrimination complaint she filed with HUD in 2013 and the failure to address her

damaged carpet in 2016.[16] As a result, this allegation also fails as a basis for the retaliation claim.

### C. Habitability

Although not specifically pleaded as a claim, Thomas suggests that SFHA has violated housing quality standards and the implied warranty of habitability since the RAD conversion. TAC at 9. Thomas alleges that residents have "been subjected to noise pollution, blight of storage containers, low water pressure, tepid water (due to main pilot blow out), black water, sandy water, and white powder exposure in units." Id. As CCDC had full management responsibility at the time these violations allegedly occurred, and SFHA had none, Thomas has brought this claim improperly against SFHA. See id. at 6. The habitability claim fails.

## IV. CONCLUSION

For the foregoing reasons, SFHA's motion for summary judgment is **GRANTED**.

**IT IS SO ORDERED.**

Dated: Mar. 7, 2018

CHARLES R. BREYER
United States District Judge

---

[16] Thomas does assert that she filed a formal grievance letter in regards to the carpet damage with Kendra Crawford and that she did not receive a reply, "thus denying Carol a grievance." TAC at 19. Thomas also asserts that she submitted a work order to the PYN Property Manager, Henry Kwan, which gives an estimate of the cost of repair. 2nd Opp'n at 5. She provides the Court with the carpet estimate, TAC Ex. M at 69, as well as the note she allegedly left for Henry Kwan, 2nd Opp'n Ex. D at 28. She also provides the Court with an e-mail exchange that she had with a property supervisor regarding the damage to her carpet, but it does not appear that any resolution was reached. Id. Ex. F at 33–37. SFHA alleges that "Plaintiff filed no timely grievance with SFHA regarding the claimed damage to her carpet caused during the annual inspection," MSJ at 15, and that "Henry Kwan gave Ms. Thomas a claim form to submit for the damages, but she did not turn in the form," Earley Decl. ¶ 12. SFHA provides no evidence to support either of these allegations.

Despite the conflicting statements, this basis for Thomas's retaliation claim fails to survive summary judgment as she does not provide any evidence that the failure to fix her carpet in 2016 was in any way related to the HUD complaint she submitted in 2013.